2026 IL App (2d) 260027-U
No. 2-26-0027
Order filed June 11, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* G.S., a minor.

(The People of the State of Illinois, Petitioner-Appellee v.
Antwon F., Respondent-Appellant).

Appeal from the Circuit Court of Kane County.
Honorable Kathryn D. Karayannis, Judge, Presiding.
No. 22-JA-147

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was no error in the trial court's judgment finding respondent father unfit and terminating his parental rights.

¶ 2    Respondent, Antwon F., *pro se*, appeals from the trial court's judgment finding him unfit and terminating his parental rights over the minor, G.S. We find no error in the trial court's judgment; thus, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    We note that Antwon has elected to proceed *pro se* in this appeal, as is his right. He has submitted a handwritten brief using the template provided on our supreme court's website. The form of the brief is not the problem, but its content is. Although parties to termination proceedings are entitled to file memoranda in lieu of an appellate brief, which have less stringent requirements

(Ill. S. Ct. R. 311(a)(6) (eff. July 1, 2018); Ill. App. Ct. Second Dist. R. 107(a)), certain basic elements should still be present, such as citations to the record, citations to case law and statutory authority, as well as clear and direct prose. What we have received instead is page after page of statements, organized by date, containing Antwon's generic complaints about the proceedings and posing rhetorical questions, all of which generally deny any responsibility for having engaged in domestic violence or for having caused the conditions that led to the minor's removal. While this court possesses the authority to strike Antwon's brief and dismiss the appeal, we have chosen to overlook these deficiencies in favor of ensuring a definitive resolution to this matter. For its part, the State specifically does not ask us to strike Antwon's brief, highlighting a pertinent interest in disregarding issues with a parent's *pro se* brief to reach finality for the minor involved. See, *e.g.*, *In re Re.R.*, 2026 IL App (4th) 260025, ¶¶ 38-44. We agree with the State that this is the better course, and we proceed to the facts of this case.

¶ 5    Connie S. gave birth to G.S. in August 2022. Antwon was not listed as G.S.'s father on her birth certificate. For context, we note that back in February 2022, the Illinois Department of Children and Family Services (DCFS) opened a case into the physical abuse of L.S. (then 15), G.S.'s older half-sister. Reports from that case indicate that Antwon, L.S.'s stepfather, struck L.S. with a broomstick, and told her that she was "lucky that she is still breathing" and that he "didn't end [her] life right now." That investigation became case No. 22-JA-36, in which L.S. was ultimately adjudicated as neglected and made a ward of the court.

¶ 6    In November 2022, DCFS received reports that Antwon had physically assaulted Connie, causing extensive "bruises all over [Connie's] body." The State subsequently filed a petition for adjudication of neglect, which alleged that G.S.'s environment was injurious to her welfare. 705 ILCS 405/2-3(b) (West 2022). Specifically, the petition alleged that there was both domestic

violence and dangerous drugs in the home (Connie's apartment in Elgin), and that both Antwon and Connie failed to protect G.S. from conditions in that environment. DCFS was also alerted that Antwon had been observed placing his hand over G.S.'s mouth, and obstructing her breathing, to get her to stop crying. The record also indicates that Connie attempted to prevent DCFS from seeing or taking custody of G.S. Accordingly, in December 2022, the trial court made an urgent-and-immediate-necessity finding and granted the State's *ex parte* request for temporary shelter care. The trial court also issued a warrant permitting the authorities to take custody of G.S. A caseworker later testified that she made four or five attempts to have G.S. taken into care, but that Connie continued to evade contact.

¶ 7    At a subsequent court date on April 24, 2023, after multiple attempts to serve Antwon, the trial court granted leave to serve him by publication. On May 5, 2023, the warrant was executed and G.S. was finally taken into protective custody; she was ultimately placed in the same foster home with L.S. On June 27, 2023, Connie appeared in court and she was admonished regarding the neglect petition. Connie indicated that G.S.'s father was either Antwon or another individual. The trial court noted that Antwon and any other potential unknown fathers had been considered served by publication. On August 30, 2023, Antwon appeared in court. Antwon reported that he does "side jobs" and was receiving disability payments. The trial court appointed the public defender to represent him and ordered Antwon to submit to paternity testing.

¶ 8    On September 13, 2023, the parties returned to court for a scheduled pretrial hearing. Paternity testing had not yet been completed. Connie stipulated to the injurious environment allegations based on domestic violence and substance abuse. Connie further stipulated that she had not been compliant with any prior court-ordered services in L.S.'s case. The court continued the case for the paternity determination.

¶ 9 On October 31, 2023, the court received the results of DNA testing and determined that Antwon was G.S.'s biological father. The court proceeded to conduct the adjudication hearing. A caseworker testified about the history of the allegations and her efforts to locate Antwon. Antwon testified that he and Connie had an "off and on" relationship for the preceding 17 years. At the hospital, after G.S. was born, Connie told Antwon that he might not be G.S.'s father. Antwon denied having ever lived with Connie and stated that he had not been involved in G.S.'s life since she was born. The court adjudicated G.S. neglected and continued the case for a dispositional hearing. The court admonished both parents to comply with all orders and service plans or risk the involuntary termination of their parental rights.

¶ 10 On December 7, 2023, the trial court held a dispositional hearing, and found that both parents were unwilling or unable to care for G.S. No transcript was included in the record for the dispositional hearing or the court's findings.

¶ 11 Following an integrated assessment, Antwon's service plan called for him to complete random toxicology screenings, individual psychotherapy, a partner abuse intervention program (PAIP), a parenting education course, interactive parent-coaching services, a psychological assessment, and a parenting capacity assessment, as well as to follow up with any further recommended services.

¶ 12 The first permanency hearing was held on March 12, 2024. After the hearing, the trial court entered findings that Antwon had not made reasonable efforts or reasonable progress for G.S. to be placed in his care. On June 11, 2024, the court entered an order following a status update in the case, admonishing both the parties and the court's caseworkers of the court's expectations. On September 18, 2024, following a permanency hearing the court found that both parents had made

reasonable efforts but could not find that the parents had made reasonable progress towards reunification. (This hearing is also not included in the report of proceedings.)

¶ 13 On December 9, 2024, the trial court heard the updated status of the case, and set a permanency review for March 17, 2025, in anticipation of a goal change. (This hearing is also not included in the report of proceedings.)

¶ 14 On March 17, 2025, prior to the start of the hearing, Antwon asked if he could be heard on complaints regarding his attorney, whom Antwon said "yell[ed] at [him] like *** a little kid." Antwon also stated that he felt "lost" and only had been involved in the case because of the paternity finding. According to him, he had already "done all the services" the court asked him to do. The court explained that the CASA and GAL reports painted a much different picture of Antwon's compliance, stating that he had been unsatisfactorily discharged from parenting coaching. Antwon insisted that "they said that we graduate" and told the court he was "going to have a lawsuit[.]" Antwon insisted that he had never received a police report concerning his alleged abuse of L.S. or G.S. and claimed that he had been falsely accused and "racially profil[ed]" concerning those incidents. The trial court continued the hearing to June 9, 2025, so that it could review the assessments and receive updated reports.

¶ 15 On June 9, 2025, the trial court held the permanency hearing. At the start of the hearing, Connie's counsel sought to introduce, at Connie's insistence, a series of police reports detailing her and Antwon's involvement with the Elgin police department, including L.S.'s removal and G.S.'s removal. Counsel candidly stated that the reports were *not* favorable to Antwon or Connie, but that counsel felt compelled to seek their admission given Connie's (and Antwon's) insistence. None of the reports was more recent than May 2023. The trial court indicated it would not admit the evidence as the hearing was about G.S.'s permanency, and the reports were not relevant to that

issue. All parties then jointly stipulated to the most recent reports by the GAL, the CASA liaison, and the agency caseworker. All reporting indicated that G.S. was struggling with significant developmental problems as an infant. G.S. required occupational therapy, developmental therapy, physical therapy, and speech therapy. Meanwhile, G.S.'s foster parents had enrolled G.S. in a therapeutic preschool and were meeting all of her needs.

¶ 16    With respect to Antwon, reporting indicated that he never remedied his unsatisfactory dismissal from parental coaching and had yet to begin individual therapy. The case notes indicated that he was on the waitlist through one of the court-service providers, Guardian Angels. When Antwon was notified that the waitlist was lengthy, he was encouraged to seek treatment from several other service providers but never attempted to. Antwon refused to provide any insurance information to the caseworker because it was "not a criminal case" and stated that it was the caseworker's job, and not his, to ensure that he received counseling. The report noted multiple instances where Antwon was combative with case workers. Despite the foregoing, during supervised visits, Antwon was generally appropriate with the minor and he had attended (via Zoom) approximately 10 of G.S.'s therapy sessions, of which she had four a week.

¶ 17    The trial court also reviewed the results of Antwon's parenting-capacity assessment. The evaluator determined that Antwon manifests severe anger issues and presents with low cognitive functioning. He reads at a second-grade level and his capacity for daily living and social skills, based on his own responses, was assessed as borderline. He reported receiving SSI benefits since he was a child for an unspecified learning disability. Antwon claimed that he was "fired from his last job because he had to attend meetings for DCFS" and expressed that the ongoing court proceedings were an inconvenience to him. Antwon also denied having committed any acts of domestic violence against Connie or L.S., and denied having been the subject of multiple indicated

findings by DCFS. Although he was observed to have mostly pleasant interactions with G.S. (under supervision), he manifested no awareness of her significant developmental needs. According to the evaluator, Antwon's statements indicate that he expects even very young children should display strict obedience and he is apt to view independent thought and development as "disrespectful."

¶ 18　After the close of evidence and the parties' arguments, the trial court made extensive factual findings. In particular, with respect to Antwon, the trial court noted multiple reports identifying specific instances where Antwon became abusive and combative with both caseworkers and treatment providers. The trial court also discussed the findings from the parenting capacity assessment. The trial court stated that both Antwon and Connie appeared unwilling or unable to accept that "this is not a criminal case but rather a juvenile case," and that it was not simply about who G.S. would live with temporarily, but about G.S.'s long-term welfare. The trial court was incredulous about Antwon's statement that he felt "lost" noting that he had over two years of access to court services from L.S.'s case and G.S.'s case in which to orient himself. The trial court found that neither parent had made reasonable efforts, or reasonable progress, and set G.S.'s permanency goal to substitute care pending a determination of parental rights.

¶ 19　The State subsequently filed a termination petition alleging that Antwon was an unfit parent on the grounds that he: (1) failed to maintain reasonable degree of interest, concern or responsibility as to G.S.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect G.S. from conditions in her environment that were injurious to her welfare (*id.* § 1(D)(g); (3) failed to make reasonable efforts to correct the conditions that were the basis G.S.'s removal during the nine months after she was adjudicated neglect (*id.* § 1(D)(m)(i)); (4) failed to make reasonable efforts to correct the conditions that were the basis G.S.'s removal during a subsequent nine-month period

(*id*.); and (5) failed to make reasonable progress toward G.S.'s return during the initial nine-month period (*id.* § 1(D)(m)(ii)).

¶ 20    The record indicates that the trial court held the unfitness hearing on October 20, and October 22, 2026. However, transcripts from those proceedings were not included in the record on appeal. Antwon has given us no explanation for their absence, or an appropriate substitute. *Cf*. Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 21    The report of proceedings resumes with the trial court's unfitness findings on January 12, 2026. The transcript of those detailed unfitness findings numbers 22 pages. Based on the evidence at the hearing, the trial court found Antwon was not credible and that the State had proved Antwon's unfitness on each count by clear and convincing evidence. The trial court further determined that it was in G.S.'s best interest to be adopted by her foster parents, whom G.S. had lived with for nearly three years.

¶ 22    At the close of the hearing, the public defender indicated she would prepare and file a notice of appeal on Antwon's behalf. Antwon requested the court appoint him appellate counsel, but also stated that he was now employed. The trial court determined that his earnings precluded a further finding of his indigency and that he could afford to hire an attorney. Nevertheless, Antwon elected to proceed with this appeal *pro se*.

¶ 23                                          II. ANALYSIS

¶ 24    As we have noted already, Antwon's appellate brief fails to comply with the most basic requirements expected of litigants in this court. The purpose of such rules is to require parties to present clear and orderly arguments so that we may properly ascertain and dispose of the issues involved. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. Antwon's *pro se* status is no excuse; "*pro se* litigants are presumed to have full knowledge of applicable court rules

and procedures and must comply with the same rules and procedures as would be required of litigants represented by attorneys." *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1067 (2009). This court is not a repository into which the appellant can dump the burden of research. *County of McHenry v. Thomas*, 317 Ill. App. 3d 892 (2000). It is fundamentally not our role to act as a party's advocate or seek error in the record. *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). In addition, as we have noted, the record is incomplete. An appellant has the burden to present a sufficiently complete record of the proceedings, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 25    Because a biological parent's right to raise his or her child is a fundamental liberty interest and involuntary termination of parental rights is a drastic measure (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), we have elected not to strike Antwon's brief or dismiss this appeal. Rather, we determine that our review will provide this case with the finality it deserves. We further note that at no point does Antwon offer any coherent argument that either he was fit to parent G.S. or that his parental rights should not have been terminated.

¶ 26    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). See 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a

trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 27  We begin with the findings of Antwon's unfitness. We need not address all five counts in the State's petition, as any one count, properly proven, is sufficient to sustain a finding of parental unfitness. *In re D.C.*, 209 Ill. 2d 287, 296 (2004). While there is no basis to disturb any of the trial court's findings, we will focus on the reasonable progress count.

¶ 28  Pursuant to section 1(D)(m)(ii) of the Adoption Act a parent may be found unfit due to "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress is an objective standard, which exists when a parent's progress in complying with directives given for the return of the children is sufficiently demonstrable such that the court, in the near future, will be able to order the child returned to parental custody. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. Reasonable progress includes compliance with service plans and court directives considering the conditions that gave rise to the child's removal and other conditions that would prevent the court from returning custody to the parent. *In re C.W.*, 199 Ill. 2d 198, 213-14 (2002).

¶ 29  The record is overwhelmingly clear that Antwon failed to make reasonable progress during the nine months alleged in the State's petition. With the exception of keeping some appointments for supervised visitation, and despite being capable of maintaining gainful employment, the record shows that Antwon failed to complete *any* of the tasks assigned to him in the service plan. Rather

than engage with service-providers, Antwon consistently maintained a negative attitude, and denied or minimized his role in the abuse of Connie, L.S., and G.S. Although we do not have a transcript of the unfitness proceedings, we have no reason to doubt that it was consistent with the evidence we have received from the hearing, or doubt that it was consistent with the trial court's extensive written and oral findings. See also *Foutch*, 99 Ill. 2d at 391-92 (explaining presumption that the trial court's judgment was correct and that the evidence supported the judgment).

¶ 30     What is more, Antwon's brief before this court maintains his hostility to the proceedings. He is laser-focused on the allegations of abuse, maintaining that he never lived with Connie or spoke to the police, and so concludes that he could not have been responsible for any physical abuse. He never addressed what services he attempted to complete and seems to have little interest in actually having G.S. placed in his care. As the trial court noted, during more than two years of post-adjudicative services, Antwon never progressed beyond supervised visitation and has shown shockingly little concern for G.S.'s welfare. This was not a borderline case. At no point in time would it have been appropriate to place G.S. in his care, as Antwon was never clear that he maintained a residence, let alone one suitable for a child. Thus, even if we were not to rely on the *Foutch* presumption, we are satisfied that the record overwhelmingly showed Antwon was unfit.

¶ 31     We reach the same conclusion with respect to the trial court's best-interests findings. At the best-interests stage, a court is not so much concerned with the parent's past conduct. Instead, a court must focus on the child's welfare and whether the termination of a parent's rights will improve the child's future. See *In re D.M.*, 336 Ill. App. 3d 766, 771-72 (2002). At this point, a parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 34. Put differently, "[t]he issue is no longer whether parental rights can be terminated; the issue is whether, in light of the child's

- 11 -

needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 32 The Juvenile Court Act enumerates factors for assessing a child's best interests, which must be considered in the context of the child's age and developmental needs. These factors include: (1) the minor's physical safety and welfare; (2) the development of the minor's identity; (3) familial, cultural, and religious background; (4) sense of attachment, including love, security, familiarity, and continuity of relationships with parental figures; (5) the minor's wishes and goals; (6) community ties; (7) the minor's need for permanence; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024). The trial court need not explicitly reference every factor in rendering its decision. *In re Jaron Z.*, 348 Ill. App. 3d 239, 262-63 (2004). We review the trial court's best-interests finding under the manifest-weight-of-the-evidence standard. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41.

¶ 33 We are satisfied that the record amply supports the trial court's best-interests determination. The transcript of the best-interests hearing shows there was considerable evidence that G.S. was well bonded to her foster parents, and that they were highly involved in helping to treat her special needs and sensory development issues. At the time of the hearing, G.S. had been in foster care, with the same foster family for nearly three years, the same foster family that took L.S. in. G.S. also refers to both of her foster parents as "Mom" and "Dad," and G.S. has a strong relationship with her foster parents' extended family. As important, G.S.'s foster parents remained committed to her permanency and to meeting all of her needs.

¶ 34 Termination of parental rights is a drastic measure (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), and we must review the facts of a termination of parental rights case with close scrutiny.

*In re S.W.*, 315 Ill.App.3d 1153, 1157 (2000). However, a trial court is in the best position to view and evaluate the parties and its termination decision is entitled to great deference. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27. After careful review of the record, and in light of the deference we grant to the trial court's findings, we agree with the State that there was no error here and that the termination of Antwon's parental rights was not against the manifest weight of the evidence.

¶ 35                                    III. CONCLUSION

¶ 36    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 37    Affirmed.