2026 IL App (2d) 260066-U
No. 2-26-0066
Order filed June 24, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

*In re* G.S., a Minor

(The People of the State of Illinois, Petitioner-Appellee v.
Connie S., Respondent-Appellant).

Appeal from the Circuit Court of Kane County.
Honorable Kathryn D. Karayannis, Judge, Presiding.
No. 22-JA-147

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was no error in the trial court's judgment finding respondent mother unfit and terminating her parental rights.

¶ 2    Respondent, Connie S., *pro se*, appeals from the trial court's judgment finding her unfit and terminating her parental rights over the minor, G.S. We find no error in the trial court's judgment; thus, we affirm.

¶ 3                                        I. BACKGROUND

¶ 4    Connie has elected to proceed *pro se* in this appeal, as is her right, but we would be remiss if we did not point out that she had alternatives. During the best-interests hearing, Connie did not return after the trial court took a brief recess. The trial court did not appoint appellate counsel for Connie, because it was unclear she wished to appeal. Because Connie was unemployed, the trial

court stated that it would certainly consider the appointment of appellate counsel if Connie decided to seek appellate review. The trial court also stated that it would continue the appointment of the county public defender for 30 days to determine if Connie wanted to appeal, and if she did, she needed only to ask, and the court would appoint appellate counsel for her. The public defender ultimately filed a notice of appeal on Connie's behalf, but it appears Connie never sought the appointment of appellate counsel.

¶ 5    Antwon F., G.S.'s biological father, likewise had his parental rights terminated in the same proceedings. Antwon remained in court until the end of the final hearing, but the trial court determined that he could afford to hire appellate counsel because he was gainfully employed. We docketed Antwon's appeal, in which he elected to proceed *pro se*. We ultimately affirmed the trial court's judgment in that appeal, noting that Antwon's handwritten brief contained multiple violations of the rules regarding appellate briefing. See *In re G.S.*, 2026 IL App (2d) 260027-U, ¶ 4. For her part, Connie's appellate brief copies the same claims and format as Antwon's appellate brief. (It also appears to have been written by the same hand.)

¶ 6    As in Antwon's appeal, Connie's brief, too, contains "page after page of statements, organized by date, containing *** generic complaints about the proceedings and posing rhetorical questions, all of which generally deny [that *Antwon* bore] any responsibility for having engaged in domestic violence or for having caused the conditions that led to the minor's removal." *Id*. For its part, the State has not moved to strike Connie's brief, having concluded that a resolution of this case on the merits should take priority to provide finality for the minor. We agree. We do not know why Connie has submitted a brief that is singularly devoted to Antwon's supposed exoneration, and which makes no argument that Connie was either fit or that her parental rights should not have been terminated. That said, as with her failure to pursue the appointment of counsel, we have been

given no reason to think that the submission of Connie's deficient appellate brief was anything less than her full and voluntary choice. With that in mind, we proceed to the facts of this case.

¶ 7    Connie gave birth to the minor, G.S., in August 2022. For context, we note that in February 2022, the Illinois Department of Children and Family Services (DCFS) began an investigation into the physical abuse of Connie's older child, L.S. (then 15), who is G.S.'s half-sister. Reports from that case indicate that Antwon struck L.S. with a broomstick, and told her that she was "lucky that she is still breathing" and that he "didn't end [her] life ***." That investigation became case No. 22-JA-36, in which L.S. was ultimately adjudicated as neglected and made a ward of the court. While that case was pending, Connie gave birth to G.S.

¶ 8    In November 2022, DCFS received reports that Antwon had physically assaulted Connie, causing extensive "bruises all over [her] body." The State subsequently filed a petition for adjudication of neglect, which alleged that G.S.'s environment was injurious to her welfare. 705 ILCS 405/2-3(b) (West 2022). Specifically, the petition alleged that there was both domestic violence and dangerous drugs in the home (Connie's apartment in Elgin), and that both Antwon and Connie failed to protect G.S. from conditions in that environment. The record indicates that Connie attempted to prevent DCFS from seeing or taking custody of G.S. Accordingly, in December 2022, the trial court made an urgent-and-immediate-necessity finding and granted the State's *ex parte* request for temporary shelter care. The court also issued a warrant permitting the authorities to take custody of G.S. A caseworker later testified that she made four or five attempts to have G.S. taken into care, but that Connie continued to evade contact.

¶ 9    On May 5, 2023, the warrant was executed and G.S. was finally taken into protective custody; she was ultimately placed in the same foster home with L.S. On June 27, 2023, Connie appeared in court and she was arraigned on the State's neglect petition. Because Connie was

unemployed, the court appointed the public defender to represent her. Antwon was not listed as G.S.'s father on her birth certificate, and Connie indicated that either Antwon or another individual might be G.S.'s father. The court ordered paternity testing.

¶ 10    On September 13, 2023, the parties returned to court for a scheduled pretrial hearing. Paternity testing had not yet been completed. At the hearing, Connie stipulated to the injurious environment allegations based on domestic violence and substance abuse. Connie further stipulated that she had not been compliant with any prior court-ordered services in L.S.'s case. At the conclusion of the hearing, G.S. was adjudicated neglected and made a ward of the court.

¶ 11    On October 31, 2023, the trial court received the results of DNA testing and determined that Antwon was G.S.'s biological father. Because of Antwon's addition to the case, the court held an adjudication hearing, after which it found that both parents had neglected G.S. Relevant here, the trial court also found that a safety plan had been established under which Connie agreed not to allow Antwon in her home, but which Connie had violated. The court admonished both parents to comply with all orders and service plans or risk the involuntary termination of their parental rights.

¶ 12    On December 7, 2023, the court held a dispositional hearing. No transcript has been provided for that hearing. However on that date, the trial court entered an order finding both parents dispositionally unfit and unable to care for G.S.

¶ 13    Connie's service plan called for her to complete individual therapy, domestic violence counseling, parental education and coaching, and to submit to random drug screening. Connie was further referred for a parenting capacity evaluation, and directed to maintain communication and cooperate with service providers.

¶ 14    The first permanency hearing was held on March 12, 2024. After the hearing, the trial court entered findings that Connie had not made reasonable efforts or reasonable progress for G.S.

- 4 -

to be placed in her care. On June 11, 2024, the court entered an order following a status update in the case, admonishing both the parties and the court's caseworkers of the court's expectations. On September 18, 2024, following a permanency hearing the court found that both parents had made reasonable efforts but could not find that the parents had made reasonable progress towards reunification. (These three hearings were also also not included in the transcribed report of proceedings.)

¶ 15    Before a scheduled permanency review hearing on March 17, 2025, Connie asked the court for copies of police reports from when L.S. was taken from her home and expressed confusion as to why G.S.'s case, a non-criminal matter, was being heard in court. The court continued the hearing to June 9, 2025, so that it could review the assessments and receive updated reports.

¶ 16    On June 9, 2025, the court held the permanency hearing. At the start of the hearing, Connie's counsel sought to introduce, at Connie's insistence, a series of police reports detailing her and Antwon's involvement with the Elgin police department, including L.S.'s removal and G.S.'s removal. Counsel candidly stated that the reports were *not* favorable to Antwon or Connie, but that counsel felt compelled to seek their admission given Connie's insistence. None of the reports was more recent than May 2023. The court indicated it would not admit the evidence as the hearing was about G.S.'s permanency, and the reports were not relevant to that issue. All parties then jointly stipulated to the most recent reports by the GAL, the CASA liaison, and the agency caseworker, as well as the parenting capacity assessment. All reporting indicated that G.S. was struggling with significant developmental problems as an infant. G.S. required weekly occupational therapy, developmental therapy, physical therapy, and speech therapy. Meanwhile, G.S.'s foster parents had enrolled G.S. in a therapeutic preschool and were meeting all of her needs.

¶ 17    The agency caseworker's report indicated that Connie was abusive and combative with service providers. In addition, Connie maintained a persistent belief that G.S.'s case was all L.S.'s "fault." Connie's parenting capacity assessment indicated that she has considerable cognitive deficits, and that "her ability to deal with everyday problems and understand basic concepts is poor." Based on a several diagnostic tests as well as Connie's statements, the evaluator assessed Connie would need "considerable assistance" before G.S. could be returned to her care. Based on the parenting capacity assessment, the caseworker attempted to enroll Connie in counseling and parenting programs that were appropriate for adults with developmental disabilities. During this process, Connie repeatedly refused to cooperate with the caseworker by signing releases or providing her insurance information. Connie insisted that her insurance information should not be used for treatment and that DCFS should both arrange for and pay for everything because it was not connected to "a criminal case." Ultimately, by the time of the first permanency hearing, Connie had only completed three sessions of individual counseling and then stopped attending. She was also unsuccessfully discharged from parenting classes.

¶ 18    After the close of evidence and the parties' arguments, the trial court made extensive factual findings. The court stated that both Antwon and Connie appeared unwilling or unable to accept that "this is not a criminal case but rather a juvenile case," and that it was not simply about who G.S. would live with temporarily, but about G.S.'s long-term welfare. The court noted that both Antwon and Connie had over two years of access to court services from L.S.'s case and G.S.'s case but had failed to make reasonable efforts or reasonable progress. The court set G.S.'s permanency goal to substitute care pending a determination of parental rights.

¶ 19    The State subsequently filed a termination petition alleging that Connie was an unfit parent on the grounds that she: (1) failed to maintain reasonable degree of interest, concern or

responsibility as to G.S.'s welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failed to protect G.S. from conditions in her environment that were injurious to her welfare (*id.* § 1(D)(g)); (3) failed to make reasonable progress toward G.S.'s return during the initial nine-month period following the adjudication of neglect (*id.* § 1(D)(m)(ii)); (4) failed to make reasonable progress toward G.S.'s return during a second nine-month period following the adjudication of neglect (*id.*); and (5) failed to make reasonable efforts to correct the conditions that were the basis of G.S.'s removal during a nine-month period after she was adjudicated neglected (*id.* § 1(D)(m)(i)).

¶ 20    On September 29, 2025, at a pretrial conference, Connie stated she had received the State's petition. The record indicates that the trial court held the unfitness hearing on October 20, and October 22, 2025. However, transcripts from those proceedings were also not included in the record on appeal. Connie has given us no explanation for their absence, or an appropriate substitute. *Cf.* Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 21    The report of proceedings resumes with the trial court's unfitness findings on January 12, 2026. The transcript of those detailed unfitness findings numbers 22 pages. Based on the evidence at the hearing, the court found that the State had proved Connie's unfitness on each count by clear and convincing evidence. (The court made similar findings for Antwon as well.) The court then proceeded to a best-interests hearing. As mentioned above, Connie did not return after the court took a recess during the hearing. After the hearing, the court determined that it was in G.S.'s best interest to be adopted by her foster parents, whom G.S. had lived with for nearly three years. As also mentioned above, after the hearing, the court offered to appoint appellate counsel for Connie within 30 days of its decision and continued the public defender's appointment to file a notice of appeal if she wished. Connie's attorney filed a notice of appeal on her behalf but apparently declined the appointment of appellate counsel.

¶ 22                                    II. ANALYSIS

¶ 23    As we said earlier, Connie's appellate brief fails to comply with the most basic requirements expected of litigants in this court. The purpose of such rules is to require parties to present clear and orderly arguments so that we may properly ascertain and dispose of the issues involved. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. Connie's *pro se* status is no excuse; "*pro se* litigants are presumed to have full knowledge of applicable court rules and procedures and must comply with the same rules and procedures as would be required of litigants represented by attorneys." *In re Estate of Pellico*, 394 Ill. App. 3d 1052, 1067 (2009). This court is not a repository into which the appellant can dump the burden of research. *County of McHenry v. Thomas*, 317 Ill. App. 3d 892 (2000). It is fundamentally not our role to act as a party's advocate or to seek out error in the record. *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009). In addition, as we have noted, the record is incomplete. An appellant has the burden to present a sufficiently complete record of the proceedings, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Because a biological parent's right to raise his or her child is a fundamental liberty interest and involuntary termination of parental rights is a drastic measure (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), we have elected not to strike Connie's brief or dismiss this appeal. Rather, we determine that our review will provide this case with the finality it deserves.

¶ 24    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2024)) sets forth a two-stage process for the involuntary termination of parental rights. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Initially, the State has the burden of proving by clear and convincing evidence that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS

50/1(D) (West 2024)). See 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.,* 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.,* 212 Ill. 2d 347, 367 (2004). On appeal, this court will not disturb a trial court's finding with respect to parental unfitness or a child's best interest unless it is against the manifest weight of the evidence. *In re N.B.,* 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R.,* 2017 IL App (2d) 160657, ¶ 16.

¶ 25 We begin with the findings of Connie's unfitness. We need not address all five counts in the State's petition, as any one count, properly proven, is sufficient to sustain a finding of parental unfitness. *In re D.C.*, 209 Ill. 2d 287, 296 (2004). While there is no basis to disturb any of the trial court's findings, we will focus on the reasonable progress counts—counts 3 and 4 of the unfitness petition.

¶ 26 Pursuant to section 1(D)(m)(ii) of the Adoption Act a parent may be found unfit due to "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). Reasonable progress is an objective standard, which exists when a parent's progress in complying with directives given for the return of the children is sufficiently demonstrable such that the court, in the near future, will be able to order the child returned to parental custody. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. Reasonable progress includes compliance with service plans and court directives considering the conditions that gave rise to the

child's removal and other conditions that would prevent the court from returning custody to the parent. *In re C.W.*, 199 Ill. 2d 198, 213-14 (2002).

¶ 27 The record is overwhelmingly clear that Connie failed to make reasonable progress during any period of time after the December 7, 2023, dispositional finding. With the exception of attending three individual counseling sessions, and some of the parenting classes, Connie made no appreciable effort to undertake any of the tasks assigned to her in the service plan. As the trial court found, rather than attempt to engage with service providers, Connie consistently maintained a negative attitude to services and court intervention in general. We note, with considerable dismay, that Connie consistently blamed L.S. for the pendency of these proceedings. (She continues to do so in her appellate brief as well.) As the trial court repeatedly explained, these proceedings were about *G.S.'s* long-term welfare. Even if these points were plausible, disputing the reasons why G.S. came under court supervision does not detract from the fact that G.S., by necessity, was a ward of the court and that Connie failed to make any reasonable progress towards G.S.'s return. Although we do not have a transcript of the unfitness proceedings, we have no reason to doubt that it was consistent with the evidence we have received from the hearing, or doubt that it was consistent with the trial court's crystal-clear written and oral findings. See *Foutch*, 99 Ill. 2d at 391-92 (explaining presumption that the trial court's judgment was correct and that the evidence supported the judgment). Even if we were not to rely on the *Foutch* presumption, we are satisfied that the record overwhelmingly showed Connie was unfit.

¶ 28 We reach the same conclusion with respect to the trial court's best-interests findings. At the best-interests stage, a court is not so much concerned with the parent's past conduct. Instead, a court must focus on the child's welfare and whether the termination of a parent's rights will improve their future. See *In re D.M.*, 336 Ill. App. 3d 766, 771-72 (2002). At this point, a parent's

interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 34. Put differently, "[t]he issue is no longer whether parental rights can be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphasis in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 29    The Juvenile Court Act enumerates factors for assessing a child's best interests, which must be considered in the context of the child's age and developmental needs. These factors include: the minor's physical safety and welfare; the development of the minor's identity; familial, cultural, and religious backgrounds; senses of attachment, including love, security, familiarity, and continuity of relationships with parental figures; the minor's wishes and goals; community ties; the minor's need for permanence; the uniqueness of every family and child; the risks related to substitute care; and the preferences of the person(s) available to care for the child. 705 ILCS 405/1-3(4.05) (West 2024). The trial court need not explicitly reference every factor in rendering its decision. *In re Jaron Z.*, 348 Ill. App. 3d 239, 262-63 (2004). We review the trial court's best interests finding under the manifest-weight-of-the-evidence standard. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 41.

¶ 30    We are satisfied that the record amply supports the trial court's best-interests determination. The transcript of the best-interests hearing shows there was considerable evidence that G.S. was well bonded to her foster parents, and that they were highly involved in helping to treat her special needs and sensory development issues. At the time of the hearing, G.S. had been in foster care, with the same foster family for nearly three years, the same foster family that took L.S. in. G.S. also refers to both of her foster parents as "Mom" and "Dad," and G.S. has a strong relationship

- 11 -

with her foster parents' extended family. As important, G.S.'s foster parents remained committed to her permanency and to meeting all of her needs.

¶ 31    Termination of parental rights is a drastic measure (*In re Gwynne P.*, 215 Ill. 2d 340, 353 (2005)), and we must review the facts of a termination of parental rights case with close scrutiny. *In re S.W.*, 315 Ill.App.3d 1153, 1157 (2000). However, a trial court is in the best position to view and evaluate the parties and its decision regarding termination is entitled to great deference. *In re N.T.*, 2015 IL App (1st) 142391, ¶ 27. After careful review of the record, and in light of the deference we grant to the trial court's findings, we agree with the State that there was no error here and that the termination of Connie's parental rights was not against the manifest weight of the evidence.

¶ 32                                III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 34    Affirmed.